**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBERT O'CONNOR,**

                              **Plaintiff,**

**-against-**                                  **04-CV-314**

**ROBERT McARDLE, D.D.S., Individually,**
**and MOHAMMED AHMED, D.D.S.,**
**Individually,**

                              **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

## I.  INTRODUCTION

Plaintiff Robert O'Connor, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), commenced this action, with the assistance of counsel, pursuant to 42 U.S.C. § 1983.  See Compl. [dkt. # 1].  Plaintiff asserts that Defendants Robert McArdle, Director of Dental Services for DOCS, and Mohammed Ahmed, a dentist employed by DOCS, violated his constitutional right under the Eighth Amendment when they denied him appropriate dental care.  Id.  Defendants have moved for summary judgment pursuant to FED. R. CIV. P. 56 contending that they were not deliberately indifferent to a serious medical need by Plaintiff.

1

## II. BACKGROUND

Plaintiff is an inmate who is serving a lengthy sentence in the custody of DOCS.  Prior to his incarceration, Plaintiff had a history of dental work, including having a root canal in tooth #8 and having a fixed anterior upper bridge spanning the 7-11 teeth.  In addition, Plaintiff was missing his #9 tooth.

On November 6, 1992, while incarcerated at Eastern Correctional Facility, a DOCS facility dentist replaced a loose filling in Plaintiff's #7 tooth, and informed Plaintiff that the tooth was "badly decayed" and that the prognosis for the #7 tooth was poor.  Although Plaintiff saw dental care providers between November 6, 1992 and February 22, 2000, Plaintiff did not seek or receive any treatment on his #7 tooth until this latter date.

Plaintiff was first incarcerated at Sullivan Correctional Facility ("Sullivan") from August 1994 until March 2002.  On December 1, 1999, Sullivan dentist Kevin McGraw noted that Plaintiff's #8 tooth appeared "apical and radilucent."  Plaintiff was unable to feel pain in his #8 tooth because of a root canal that had been performed prior to his incarceration.  Dr. McGraw referred Plaintiff to an oral surgery clinic for evaluation and a possible apicoectomy.[1]  Dr. McGraw again saw Plaintiff on January 26, 2000 and February 10, 2000 in relation to problems with Plaintiff's #15 tooth, and Plaintiff did not mention any problems with his #7 and # 8 teeth on either of these occasions.

On February 22, 2000, Dr. John Frattellone, an oral surgeon who was employed part time by

---

[1]  An apicoectomy is a procedure whereby an oral surgeon raises a flap of soft tissue, or "gingiva," to access the tip of a tooth inside the jaw bone.  High-speed instrumentation is then used to remove the apical third, or tip of the root of the tooth, as well as any infectious tissue.  Apicoectomy procedures are performed in conjunction with root canal treatments.  An apicoectomy is typically performed by the oral surgeon after the root canal is completed by the treating dentist.

DOCS, examined Plaintiff, diagnosed him with a possible "alveolar abscess" of Plaintiff's #7 and # 8 teeth, and advised him about potential methods of treatment, including an apicoectomy. Dr. Frattellone informed Plaintiff of the risks and benefits of such treatment and further advised that it could compromise his existing bridge.

Also on February 22, 2000, after meeting with Dr. Fratalone, Plaintiff wrote to defendant Dr. Robert McArdle, Director of Dental Services for DOCS, and stated in his letter that "[he] was advised that [his 7 tooth] was infected and decayed." He further wrote that "[w]ith his tooth gone, [he] will then have two teeth missing – and [his] old bridge would be useless." Plaintiff further requested that he could replace the bridge at his own expense. On March 23, 2000 Plaintiff advised Dr. Fratalone that he desired to get the apicoectomy procedure, and on March 28, 2000 Dr. McArdle responded to Plaintiff's letter and indicated that a treatment plan would be presented to Plaintiff upon his upcoming visit with the oral surgeon.

Plaintiff did not the keep appointment with the oral surgeon scheduled for September 2000, and he contends that he was prevented from attending because he was confined to his cell. When Plaintiff returned to see Dr. Frattellone on October 19, 2000, he told Dr. Frattellone that he was "managing" the pain by gargling with saltwater–sometimes as much as twelve times a day–but that he no longer wished to have the apicoectomy procedure if it "carried the possibility of compromising [his] bridge." O'Connor Dep. 57:7-58:25. Dr. Frattellone also examined Plaintiff on this date and found that Plaintiff's gum around his #7 and # 8 teeth were "nontender," and that there was "no mobility to bridge/buckle expansion over [Plaintiff's # 7 and # 8 teeth]." Frattellone Dep. 47:3-12. Defendant Dr. Mohammed Ahmed, Sullivan's facility dentist, was also present while Dr. Frattellone examined Plaintiff. Dr. Ahmed discussed the pain Plaintiff had experienced and,

although Plaintiff was not in pain at that time, told Plaintiff that he could perform a root canal on

Plaintiff's #7 tooth to "ward off any future potential pain from this tooth."  O'Connor Dep., Exh. B

at pp. 3-4.  On October 19, 2000, Plaintiff wrote to Dr. Ahmed and stated that he wished to proceed

with the root canal.

On January 28, 2001, Plaintiff wrote to Dr. Ahmed and stated that on the previous day, his

#7 tooth had "started giving [him] considerable pain."  Plaintiff's Exh. 9.  While Plaintiff was still

able to eat despite his pain, it did interfere with his eating.  O'Connor Dep. 132:17-20.  Two days

later, on January 30, 2001, Dr. Ahmed again examined Plaintiff, noted a chronic periapical

pathology, and recommended that Plaintiff's #7 tooth be extracted.  Dr. Ahmed offered to extract

the tooth, replace it with a partial removable denture, and cut the crown from #7 so that the rest of

the bridge would stay intact.  Ahmed Dep., 59:21-60:9.  Because Plaintiff did not want to lose his

permanent fixed bridge, he refused the extraction and insisted that Dr. Ahmed perform a root canal

on the tooth instead.  Id.  Although Dr. Ahmed believed the root canal would be unsuccessful,

Ahmed Dep., 80:16-20, he agreed to perform the root canal and apicoectomy anyway.  On his

follow-up appointment on February 7, 2001, Dr. Ahmed again expressed his reservations to Plaintiff

about the root canal and apicoectomy procedure, but Plaintiff persisted.  On February 14, 2001, Dr.

Ahmed began the root canal treatment on Plaintiff's #7 tooth and completed the procedure on

February 22, 2001.

Plaintiff submitted a grievance to Sullivan's Inmate Grievance Resolution Committee on

February 26, 2001, in which he wrote:

> [t]he dental department at Sullivan diagnosed an abscessed and decayed top incisor of mine
> in 1998.  It was thereafter negligent.  I was repeatedly advised that since the tooth referred to
> is under a crown that is part of a permanent bridge that spans five teeth in the front of my

mouth, it would be best to leave it alone as long as it was not giving me pain.  The pain
became unbearable on January 27, 2001.  Thereafter, I was advised by the dental department
that even with the root canal treatment that I was now offered and have had performed, that
there was a poor prognosis for the success of this tooth – as well as the other teeth under the
bridge.  Further, I was advised by the dental department that the tooth referred to has been
placed in even more jeopardy because it will be more at risk for decay considering that part
of the crown was drilled away to perform the root canal and the tooth will not be sufficiently
enclosed.  The Health Services Policy Manual, Policy 2.0 Dental Policy, states that the
"scope of Services" includes fixed prostheses (bridges)" (p. 5 of 19).  It is hard to imagine a
more compelling case where a replacement bridge would be more appropriate.

Plaintiff requested that DOCS provide him with a replacement bridge to replace his existing

permanent fixed bridge.  Plaintiff had filed this grievance after Dr. Ahmed had performed a root

canal on Plaintiff's #7 tooth but before Dr. Fratalone had completed the apicoectomy on his #7 and

# 8 teeth and therefore, at that point, it was impossible to tell whether the efforts undertaken by the

two doctors would ultimately save his #7 and # 8 teeth.

On March 1, 2001, Dr. Frattellone conducted the apicoectomy on Plaintiff and obtained what

he considered a "good result."  Frattellone Dep., 54:14-55:5.  On March 12, 2001, the Sullivan

facility Superintendent denied Plaintiff's grievance and wrote: "[t]he Sullivan Correctional Facility

Dentist states the [Plaintiff's] dental needs are being addressed, in accordance with the New York

State Health Service Policy Manual 2.0 – sick call procedure."  Plaintiff then appealed the

Superintendent's decision to DOCS's Central Office Review Committee ("CORC"), which in April

18, 2001, unanimously rejected Plaintiff's February 26, 2001 grievance and denied Plaintiff's

request for a replacement bridge.  In CORC's decision, they noted that:

> [Plaintiff] has been examined by Regional Dental Director and was advised that the
> procedure performed by the oral surgeon could not be determined to be successful until more
> time had passed. [Plaintiff] is advised that if the dentist determines in the future that the
> bridge needs to be replaced, that the grievant must request this service through an outside
> provider at his expense.

In fact, Plaintiff had met with DOCS's Regional Dental Directors Dr. William Griffin and Dr. Martin Korfman on April 5, 2001, who explained to Plaintiff that it was too early to determine whether Plaintiff would need to replace his bridge because the apicoectomy procedure had been performed only recently.

On June 11, 2001, Plaintiff submitted a second grievance, in which he again requested that he be provided with a new permanent fixed bridge to replace the one he had when he first entered DOCS' custody.  Ultimately, this grievance was also denied, and the Superintendent wrote in the denial that although there is a risk that Plaintiff could lose his #7 tooth, it has been treated, and the bridge was then intact and operable.  The Superintendent further advised that if the Plaintiff were to lose his tooth or bridge in the future, that Plaintiff could submit a dental slip to the facility dentist for appraisal at that time.

On March 8, 2002, Dr. Ahmed submitted a formal request for the approval of a replacement permanent fixed bridge, in which he wrote: "[b]ridge slightly wiggles due to root caries on abutment #7 tooth.  Offered [patient] to cut the crown #7 from the bridge [anterior] to #7, [and] replace [with] partial.  Plaintiff keeps insisting on a fixed bridge."  On March 18, 2002, Dr. McArdle denied authorization for a permanent fixed bridge, and authorized only a removable partial denture.

To this date, Plaintiff still has his #7 and # 8 teeth and, on May 4, 2005, Dr. Gary Epstein saw nothing about Plaintiff's #7 or # 8 teeth "that rendered [their] condition[s] questionable" or indicated that the care previously provided to Plaintiff had been improper.  On or about that date, Dr. Epstein also removed and replaced Plaintiff's old fixed bridge.

## III. STANDARD FOR SUMMARY JUDGMENT

It is well settled that on a motion for summary judgment, the Court must construe the

evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 592 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor.  Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998).

## IV. DISCUSSION

Plaintiff's Complaint, and argument in opposition to summary judgment, revolves around his claim that Defendants denied him a replacement fixed bridge which he had agreed to purchase at

7

his own expense, and thereby violated his Eighth Amendment right. See Compl, ¶ 4 ("Summary of Claim: This claim is for the deliberate indifference by [Defendants] for their failure to provide claimant with access to preventative, curative, restorative, and prosthetic dental care to maintain good dental and general health.").  In this regard, Plaintiff proceeds on a theory that as a state prisoner, he is entitled to "the same standard of care that would be available to him in the general community." Plaintiff's Statement of Material Facts in Dispute ("Plf's Rule 7.1 Stat."); ¶ 146, Rosenthal Aff." ¶ 4 ("O'Connor did not receive . . . that which was commensurate with what he would have received in the non-prison community."); Plaintiff's Brief in Opposition to Motion for Summary Judgment ( "Opposition Brief") at 15-16 ("the standard of care acceptable in the general community was to develop a treatment plan that allowed [plaintiff] the choice of a replacement bridge for the existing bridge.").  Defendants take exception with the legal premise of Plaintiff's claim, see Def. Reply Mem., pp. 1-2, and argue that the motion for summary judgment should be granted because no Eighth Amendment rights have been violated.

### A. Eighth Amendment Analysis

Generally, the Eighth Amendment provides that prison officials have a duty to supply inmates with medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994).  However, "[t]his does not mean...that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976).  A prison official will only be held liable for failure to provide medical treatment to an inmate under the Eighth Amendment if he is deliberately indifferent to an inmate's serious medical need. Id. at 104. Thus, in order to prevail on such a claim, a Plaintiff must prove that he (1) suffered from a serious medical condition, and (2) that the prison official was deliberately indifferent to Plaintiff's serious

medical condition. Id.

The first element, serious medical condition, exists where there is "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)).  Factors to be considered in determining whether Plaintiff suffered from a serious dental, as well as medical, condition include "pain suffered by the Plaintiff, the deterioration of the teeth due to lack of treatment, or the inability to engage in normal activities."  Id. at 703 (citations omitted).

The second element, deliberate indifference, involves a subjective test designed to determine whether a prison official acted with a "sufficiently culpable state of mind."  Farmer, 511 U.S. at 834 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  While "deliberate indifference entails something more than mere negligence...it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835.  The test is whether the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  The Second Circuit has stated:

> It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, that fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.  Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.

Chance, 143 F.3d at 703 (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) and Estelle, 429 U.S. at 106).

9

**B.  Need for Replacement Bridge**

Plaintiff arguably presents two intertwined claims - an Eighth Amendment claim arising from the denial of a replacement fixed bridge, and an Eighth Amendment claim arising from the denial or delay in treatment to Plaintiff's # 7 & # 8 teeth causing Plaintiff to suffer unnecessary and wanton pain.   The Court will address each claim independently starting with the claim arising from the denial of a replacement fixed bridge.

   1.  Serious Medical Condition

Drawing every ambiguity and reasonable inference in favor of Plaintiff,  no reasonable jury could find that Plaintiff's need for a permanent fixed bridge to replace his existing one constitutes a "serious medical need."  Plaintiff argues that this replacement bridge was necessary to avoid any future tooth decay in his #7 and # 8 teeth.  However, Plaintiff offers nothing but speculation to support his conclusion that a replacement bridge was necessary to avoid tooth decay. See e.g., Epstein Dep., 28:15-30:10.

Further, at the time Plaintiff demanded a replacement bridge in his February 26, 2001 letter, Dr. Ahmed had just recently performed a root canal on Plaintiff's #7 tooth, and Dr. Frattellone had yet to complete the apicoectomy on his #7 and # 8 teeth.  Thus, at that point, it was impossible to tell whether these procedures would ultimately save his #7 and # 8 teeth and prevent the future decay that Plaintiff worried about.  Plaintiff's "need" for a replacement bridge was merely speculative, in that he thought his bridge could be put in "jeopardy" were he to lose either his #7 or # 8 teeth. Since the treatment provided by Dr. Ahmed and Dr. Frattellone proved successful and Plaintiff never lost either of the teeth under the fixed bridge, there was no urgent need for a replacement.

<u>2. Deliberate Indifference</u>

Even assuming that Plaintiff could show that his need for a replacement bridge constituted a "serious medical condition," no reasonable jury could find that Defendants were deliberately indifferent to his needs.  When Dr. Ahmed discovered that Plaintiff's "[b]ridge slightly wiggles" and submitted a formal request to Dr. McArdle for approval of a fixed permanent bridge, he offered the alternative procedure of cutting the #7 crown from the bridge and replacing it with a removable partial denture.  Dr. McArdle denied the authorization of the replacement bridge, but did authorize the alternative removable partial denture.  Although it was perhaps not Plaintiff's ideal solution, this procedure would have been adequate to solve Plaintiff's bridge problems.  Plaintiff 's argument, boiled to its core, is simply that he did not receive the care that he *wanted*.  But that is not the standard under the Eighth Amendment.  As the Second Circuit has noted:

> The State is not constitutionally obligated, much as it may be
> desired by inmates, to construct a perfect plan for dental care that
> exceeds what the average reasonable person would expect or avail
> herself of in life outside the prison walls....We are governed by the
> principle that the objective is not to impose upon a state prison a
> model system of dental care beyond average needs but to "provide
> the minimum level of [dental] care required by the Constitution."
> "The Constitution does not command that inmates be given the kind
> of medical attention that judges would wish to have for themselves...."
> "[T]he essential test is one of medical necessity and not one simply of desirability."

<u>Dean</u>, 804 F.2d at 215 (citations omitted) (alterations in original).

At most, Plaintiff asserts a medical malpractice claim, claiming that he received one treatment when he should have received another.  Medical malpractice claims, however, are not actionable under 42 U.S.C. § 1983.  <u>Chance</u>, 143 F.3d at 703.  "[T]here is no right to the medical treatment of one's choice if the prescribed treatment is based on applicable medical standards,"

11

Hogan v. Russ, 890 F.Supp 146, 149 (N.D.N.Y 1995), and Plaintiff's "mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment."  Estelle, 429 U.S. at 106.   Thus, to the extent Plaintiff's claim is based upon the denial, or the delay, in receiving the replacement bridge, the claim is dismissed.

### C.  Denial of, or Delay in, Appropriate Treatment

To the extent Plaintiff argues that the condition of his #7 and # 8 teeth themselves constituted a serious medical need to which Defendants were deliberately indifferent, the claim also fails. In this regard, Plaintiff seemingly argues that, like the plaintiff in Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000),  the denial or delay of dental treatment constituted a serious medical condition that caused him to suffer substantial pain and to which the Defendants were deliberately indifferent.

#### 1.  Serious Medical Condition

In Harrison, the incarcerated-plaintiff suffered from a cavity in one of the few teeth remaining in his mouth. Harrison, 219 F.3d at 134-137.  When he sought treatment for the cavity, prison dentists felt that another tooth was more seriously affecting his well being and should be extracted, and refused to treat the cavity until Harrison consented to the extraction of this other tooth. Id. Harrison refused and thus his cavity went untreated for a significant period of time despite his complaints of pain from the tooth with the cavity. Id.

Of course,  "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" Id. at  136 (quoting Chance, 143 F.3d at 702).  The Harrison majority held that while a cavity is not a serious medical condition in the strict sense, it is a degenerative condition which, if left

12

untreated indefinitely, "is likely to produce agony and to require more invasive and painful

treatments, such as root canal therapy or extraction." Id. at 137.  Consequently, the Court held in

Harrison that "because a tooth cavity will degenerate with increasingly serious implications if

neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case

law." Id. (citing Chance, 143 F.3d at 702-03).

     The facts of the instant case are clearly distinguishable from Harrison.  First, as the Harrison

majority stated:

> This is *not* a case of *delayed* treatment as the dissent suggests.   Defendants' conduct
> on this record can be construed as: (1) a flat refusal of medical treatment for a
> condition that if left untreated is serious and painful; or (2) a conditional refusal of
> such treatment, subject to Harrison's consent to undergo an unwanted medical
> procedure that would deprive him of a body part he wished to keep. Either way, a
> reasonable jury could find that Harrison was *refused treatment* of a degenerative
> condition that tends to cause acute infections, debilitating pain and tooth loss if left
> untreated.

Harrison, 219 F.3d at 137 (emphasis in original).

     In the instant case, and despite Plaintiff's contention to the contrary, there was no "flat

refusal of medical treatment" nor was there a "conditional refusal of such treatment," – at least not a

refusal of medical condition that reasonably could have caused significant pain in the future.  The

refusal here, if there was one, was to Plaintiff's demand to provide him a replacement bridge. As

indicated above, there is no evidence that the refusal in this regard could have resulted in further

*significant* injury or the unnecessary and wanton infliction of pain. Further, the facts indicate that

Plaintiff was offered certain procedures addressed to his decayed # 7 tooth that *he* initially declined

in order to save the viability of the bridge, and that Plaintiff failed to advise of the severe pain that

he now complains of with regard to his # 7 & # 8 teeth until January 28, 2001.[2]

Second, it is highly doubtful that Plaintiff could establish the requisite "serious medical

condition" even as applied in <u>Harrison</u>.[3]  As District Court Judge Castel of the Southern District

recently pointed out:

> "A serious medical condition exists where 'the failure to treat a prisoner's condition
> could result in further significant injury or the unnecessary and wanton infliction of
> pain.' " <u>Harrison</u>, 219 F.3d at 136 (quoting <u>Chance</u>, 143 F.3d at 702). Although "there
> is no settled, precise metric to guide a court in its estimation of the seriousness of a
> prisoner's medical condition," the Second Circuit has identified several relevant
> factors. <u>Brock v. Wright</u>, 315 F.3d 158, 162 (2d Cir. 2003). Specifically, a court
> should inquire about "whether a reasonable doctor or patient would perceive the
> medical need in question as 'important and worthy of comment or treatment,' ...
> whether the medical condition significantly affects daily activities, and ... the
> 'existence of chronic and substantial pain.' " <u>Id</u>. "When the basis for a prisoner's
> Eighth Amendment claim is a temporary delay or interruption in the provision of
> otherwise adequate medical treatment, it is appropriate to focus on the challenged
> *delay* or *interruption* in treatment rather than the prisoner's *underlying medical*
> *condition* alone" in evaluating the objective prong. <u>Smith v. Carpenter</u>, 316 F.3d 178,
> 185 (2d Cir. 2003) (emphasis in original). In doing so, a court may consider the
> "absence of adverse medical effects or demonstrable physical injury" associated with
> such delay or interruption. <u>Id.</u> at 187.

---

[2] In this regard, the record indicates: (i) plaintiff made numerous visits to DOCS' facility dental clinics between November 6, 1992 and February 22, 2000, and never once sought treatment for either of those teeth (Plf's 7.1 Statement, ¶¶ 12-13.; O'Connor Dep., Exh. A at DOCS 120-27); (ii) on more than one occasion plaintiff advised members of DOCS' dental staff that his # 7 and # 8 teeth were not causing him pain, or that his dental issue had "stabilized" (Plf's 7.1 Statement at ¶¶ 25 and 61; O'Connor Dep., 58:20-25 and Exh. A at DOCS 126, 128, Deposition of John Frattellone, Sept. 13, 2005 ("Frattellone Dep."), 46:16-47:12; 48:21-49:5); (iii) as a result of the root canal performed on plaintiffs' 8 tooth before his incarceration, plaintiff admittedly could not feel pain at his 8 tooth (Plf's 7.1 Statement, ¶ 26); (iv) plaintiff regularly refused the treatment that was recommended and offered by DOCS' dental providers (Frattellone Dep., 46:16-47:12; 48:21-49:5 and Plf's Exh. 6; O'Connor Dep., 58:20- 25; Plf's 7.1 Statement, ¶¶ 69-72, 82.), (v) plaintiff was not in pain on October 19, 2000, when Ahmed nevertheless suggested "that he could perform a root canal to ward of *any future potential pain* from [plaintiff's 7 tooth]" (O'Connor Dep., Def's Exh. B at 3-4); (vi) in a letter addressed to Dr. Ahmed dated Sunday, January 28, 2001, plaintiff wrote that his 7 tooth "*started* giving him pain" on January 27, 2001 (Deposition of Mohammed Ahmed, Aug. 8, 2005("Ahmed Dep."), Plf's Exh. 9 (emphasis added)), and (vii) plaintiff declined to undergo treatment for his 7 an 8 teeth because they were "not giving [him] any great or chronic pain" (O'Connor Dep., Exh. D at DOCS 217-18).

[3] The application of the serious medical need element of an Eighth Amendment claim was a central point of dissent in <u>Harrison.</u>  <u>See id.</u>, at 142 ("[T]he <u>Estelle</u> standard "deliberate indifference to serious medical needs" has metamorphosed to include "deliberate indifference to non-serious medical needs if they might become serious in the face of deliberate indifference.") (Meskill, C.J.)(dissenting).

Farid v. Ellen, 2006 WL 59517, at * 10  (S.D.N.Y. Jan. 11, 2006).

Plaintiff's facts, even when accepted as true, do not meet this standard. In February of 2000 when Plaintiff first complained to Dr. Fratalone of transient swelling and pain in tooth # 7, Dr. Fratalone advised of treatment options.  It was not until March 23, 2000 that Plaintiff indicated that he wished to proceed with the apicoectomy.  While there is a lapse in the treatment during this time period, when Plaintiff again saw Dr. Fratalone on October 19, 2000, Plaintiff indicated that he has been managing the pain with salt water rinses and indicated that he did not wish to have the apicoectomy if it raised the possibility of compromising his bridge. Further, on this date Defendant Dr. Ahmed offered to do a root canal on the #7 tooth to alleviate any pain he might then be having or might have in the future.

While the level of the pain that Plaintiff might have been experiencing at this time cannot be evaluated on the cold record, it is significant to note that on January 28, 2001 Plaintiff wrote to Dr. Ahmed and advised that he was "starting" to experience severe pain in the tooth. From this point forward, as discussed below, the treatment of Plaintiff's teeth and related pain moved relatively quickly.  Thus, it is difficult to imagine that the reports of pain before this period of time amounted to a condition that either the dentists or Plaintiff  perceived as  "important and worthy of comment or treatment," that *significantly* affected Plaintiff's daily activities, or that caused  "chronic and substantial pain."  Brock, 315 F.3d at 162.

Further, there is little if any "demonstrable physical injury" associated with the delay or interruption in treatment of the # 7 tooth other than his subjective claims of pain.  Smith, 316 F.3d at 185; see also Farid, 2006 WL 59517, at * 10  ("Despite plaintiff's detailed record of various alleged lapses by defendants in treating his condition, plaintiff has come forward with no evidence of how

15

this alleged delay exacerbated his condition or worsened his prognosis for effective treatment.");

Gross v. Buscema, 298 F. Supp. 289, 298 (N.D.N.Y. 2003) (McAvoy, J.) ("An inmate who

complains that delay in medical treatment rose to a constitutional violation must place verifying

medical evidence in the record to establish the detrimental effect of delay in medical treatment to

succeed.").  Plaintiff still has his # 7 &  # 8 teeth, Plf's 7.1 Statement, ¶ 153; see also, Rosenthal

Dep., 101:1-16, and  Dr. Gary Epstein, plaintiff's treating physician (and designated expert) offered

uncontroverted testimony that as of May 4, 2005, there was nothing about Plaintiff's # 7 or # 8 teeth

"that rendered [their] condition[s] questionable" or indicated that the care previously provided to

Plaintiff had been improper. Plf's 7.1. Statement, ¶ 154; Epstein Dep., 32:16-34:12; 84:23-85:5;

87:10-18.

> ### 2.  Deliberate Indifference

Further, even assuming that Plaintiff's condition with his # 7 and # 8 teeth amounted to a

serious medical condition, no reasonable jury could find that Defendants were deliberately

indifferent to this need.  Plaintiff's #7 and # 8 teeth had been badly decayed prior to coming under

the care of Defendants.  When Plaintiff advised Dr. Ahmed that his #7 tooth had been giving him

"considerable pain" on January 28, 2001, Dr. Ahmed recommended on January 30, 2001 that

Plaintiff's #7 tooth be extracted, and he further offered to replace it with a removable denture, and

cut the crown from #7 so that the rest of the bridge would stay intact.  Fearful of losing his

permanent bridge, Plaintiff refused this procedure and insisted on a root canal and apicoectomy

instead.  On February 2, 7, & 12,  2001, Plaintiff was seen by Dr. Ahmed at which times Plaintiff's

prescription medication was addressed, and on February 14, 2001,  Dr. Ahmed started the root canal

procedure.  The root canal was completed on February 22, 2001, and, on March 1, 2001, Dr.

Frattellone performed the apicoectomy. Both procedures obtained a "good result" and, as indicated above, Plaintiff still has these teeth.

Based on these facts, no reasonable jury could find that Defendants knowingly disregarded an excessive risk to Plaintiff's health for an inordinate length of time. See Harrison, 219 F.3d at 138 ("District courts in this Circuit have ruled that a one-year delay in treating a cavity can evidence deliberate indifference on the part of prison officials")(citations omitted).  Rather, once Plaintiff notified Dr. Ahmed of his significant pain, Dr. Ahmed and Dr. Fratalone very promptly performed the procedures on Plaintiff that he desired, and Plaintiff retains his #7 and # 8 teeth to this day.  No reasonable jury could conclude that Dr. Ahmed, or Dr. McArdle,[4] were deliberately indifferent to Plaintiff's  serious medical needs.  See Harrison, 219 F.3d at 138.

## V.  CONCLUSION

Based upon the reasons set forth above, the Defendants' motion for summary judgment is **GRANTED** and the action is **DISMISSED**.

**IT IS SO ORDERED**

DATED:February 22,2006

Thomas J. McAvoy
Senior, U.S. District Judge

---

[4] Plaintiff concedes that Dr. McArdle did not perform any dental work on plaintiff. Plfs' 7.1 Statement, ¶¶ 144, 145. Moreover, Plaintiff offers nothing to rebut the Dr. McArdle's sworn statement that he "was not in any way involved in providing dental care to plaintiff with respect to his 7 and 8 teeth." See Declaration of Robert F. McArdle, D.D.S., executed on Dec. 5, 2005 ("McArdle Dec."), ¶ 4. Accordingly, Dr. McArdle did not have the requisite degree of personal involvement upon which to premise a claim under the Eighth Amendment arising solely from the denial of treatment to the # 7 & # 8 teeth. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).